May it please the court. My name is Mark Labaton. I represent the whistleblower, Stephen Hartpence, who is a former executive vice president at Kinetics, now part of the 3M company. I intend to reserve two minutes for my rebuttal, and I'll keep track of my time. I'd like to focus the court on two areas of law, and also a series of areas of fact. But before I turn there, your honors, before I go there, I'd like to say a few words about our case. In late 2000, CMS approved Medicare reimbursement for a home usage device that KCI, the defendant, provided. And it was a unique vacuum healing device that was supposed to be used only to The rules put in place then stated in no uncertain terms that KCI could only use this and bill Medicare for continuous monthly uses of this expensive device, when a wound showed tangible signs of improvement as measured tangible measured signs of improvement. False claims acts in our case, the false claims in our case, relate to the hundreds of millions of dollars in claims that KCI billed Medicare in violation of the rule. And despite years of efforts at the highest highest levels of KCI, the corporate CEO, executive vice president. Do you agree that the stall cycle claims that's the only thing left before us? No, your honor, I do not. There are two things left before you. The stall cycle claims and and that's an artificial term. Stall cycles refers to a month in which there was no wound improvement. And KCI continued to bill for a second month. So your honor, there are there are what what case that's the other piece that's still here. The other piece that's still here is the months that that KCI billed for when there was no signs of wound improvement. And so there was no measure improvement for month one, KCI billed for month two. KCI uses a term that's an artificial term called stall cycle that is first mentioned after I repeatedly failed to get the rules changed here. That term is first mentioned in 2004, four years into the fraud of the case. But we're talking about any kind of month where the wound didn't improve, whether it's the second month, the third month, service is supposed to stop and and our allegations are stopped. What is what is stall cycle claims by defendants is a subset of these claims, your honor. And if I I'd like to address now the two areas of law that the judge committed and then discuss some of the Can you hear us? I can't hear you. Judge Burzon's been trying to ask you a question. I'd overheard. I didn't hear. I didn't hear a word. Can you hear her? I cannot hear Judge Burzon. I could hear you. Really? Can you hear me now? I can't hear Judge Burzon. That's very peculiar because everybody else can. Hello? You make a very difficult argument. Hello? Mr. Labaton-Meyd, I suggest that you join the call by the phone number provided in the email that was sent to you. If you cannot hear all of the panel. Let me let me get that phone number. We'll stop the clock for now, please, while we straighten this out. I can't hear. I heard Judge Collins. I'm able to hear. Yes, Judge Collins was got you to understand that somebody else was trying to speak to you. Judge Burzon was trying to speak at you. We have stopped the clock so that you can figure out your technical issue. I am the AV technician. I'm also speaking to you from Judge Collins's connection. You can hear me, okay? Judge Baldock, would you mind saying hello? Yes, I can hear so far. Can you hear me? We can hear Judge Baldock. Mr. Labaton, could you hear Judge Baldock just now? I cannot hear Judge Baldock. Okay. I am not certain why that might be the case. I have not seen this before. I'm not sure either. We were set up and we did a test yesterday. Everyone, yes, everyone is connected and everyone is hearing everything. Mr. Lynch, you're able to hear us? I'm sorry, Mr. Luce? Yes, sir. I can hear. Mr. Luce is able to hear all panel members? I can hear all panel members, although Judge Burzon's connection is a bit scratchy. I've noticed that in earlier arguments. Well, I don't know why, but in any event. That's much better, Your Honor. Thank you. I could actually hear you better then. And you can hear me? This is Judge Baldock. You're a little more faint, Judge Baldock, than in the earlier arguments. Perhaps it's proximity to the speaker. I'm sorry. I'm out of my depth when it comes to technology. Can you hear me now? Is that better? Yes, Your Honor. All right. Mr. Labaton, are you hearing Judge Baldock and Mr. Luce speak? I am hearing Mr. Luce speak. Okay. I'm not hearing Judge Baldock. I'm going to ask you to... Could you give me that? I don't have my phone in the room with me. Could you tell me the number to call? The phone? We just sent it to you. By email? By email. Right. Could you tell me that? Because I'll call on a conference line. Yes. Stand by, please. And I think my time... There was a lag before you stopped my time, but I'm not sure about that. Okay. Don't worry about the time. I'll let you finish what you need to say. Judge, can you hear me? The world of corona. But we haven't had this problem before. Well, he can't hear me. Okay. The phone number is 669-254-5252. The meeting ID number is 161-261... 16... Wait. 161... Yes. I apologize. Stand by just a moment. That was incorrect. The first part was correct. 669-254-5252? That is correct. Okay. The meeting ID number is 161-814-8691 with the password 909-669. Okay. So, 669-254-5252, 161-814-8691, 909-669. Correct? 8691 and then 909-669. Correct. Okay. So, I can just call in our conference call number and I should get... Yes. Yes. I'll see you come up in the waiting room and I'll admit you into this conference. I'm going to mute your audio when you connect by phone. Okay. ...happen that a participant could not hear... You could hear most participants but not certain other participants. I've never seen that. Mr. Labaton, can you hear us? Yes, I can. Okay. I can hear you now. Judge Berzon. Can you hear me? I can't hear you. I did not hear you and I apologize, Your Honor, last time. I was talking and I didn't hear you. Why don't we try Judge Baldock? Can you hear Judge Baldock? Can you hear me now? This is Judge Baldock. Is that Judge Baldock? Yes, I can, Judge Baldock. All right. All right. I'm very sorry to have your argument interrupted this way. It's a grave artifact because I hear some people and not other people. Anyway, why don't you go on and we'll give you at least one more minute. I'm sorry, Judge Berzon. I heard you but it wasn't that clear. I said you may resume your argument and we will put another minute on the clock. Okay. Thank you, Your Honor. So, as I was saying earlier, the rules put in place here stated in no uncertain terms that KCI could not bill Medicare for continuous months of usage unless the wound showed tangible signs of measured wound improvement and despite this effort... I'm assuming that there was some issue other than this so-called cycle, stall cycle, but it sounds like they're both the same thing. The second thing you said was the same as the first thing, no? Right, right. Okay, Your Honor. I'll move on. I'm sorry that I didn't know where we got cut off. I was going to address two issues, Your Honors, of errors of law and then address errors of fact in the court's opinion. The first error of law involved the court's... involved the court's... the Escobar opinion that overrides consideration here. This opinion required the district court to look not just at the government's conduct but also at the defendant's conduct and the court failed to do so. Here, the defendant's conduct in their efforts and time that they spent at the highest corporate level to try to get these rules changed and failed is a confession of the materiality of their conduct and their knowledge. They would not have done this if it wasn't material and they would not have devoted those resources to it if it was not material and they knew that. The CEO of the company flew halfway across the country to South Carolina in an unsuccessful attempt to try to get these rules changed and said after... and in addition to that, the court did not address in looking at materiality the issue that the fact that the rules put in place and the approval of this device in the first place was just to jumpstart treatment and not to be used beyond that unless medically necessary. The second error of law, Your Honors, related to the court's interpretation of the critical rule at issue in this case, the LCDs. Now, the court's summary judgment order on page two specifically defines what the judge believed was the issue before her and she says that the ultimate issue was whether the KX... whether the company here, KCI, falsely added the KX modifier to claims for wounds that ultimately improved even though the wound showed no prior improvement in the prior month. That is not the plain language of the LCD. That's what the defendant desired that the medical directors rewrite it to say, but that is not what it said. This is a misreading of the criteria. That's what it says. The question is whether in light of the standards in the Escobar case, it's material because the government knew that the company had a different view of what should properly be paid despite the LCD and submitted them and made its view known that it was going to go forward submitting them. Your Honor, that is a different issue. That's the issue before us. That's what the district court granted summary judgment on that issue, so why don't you address that? Okay, that issue gets to a series of errors in fact made by the court. The court bases the opinion that the company knowingly approved and paid claims on just a few pieces of evidence and there certainly is strong countervailing evidence in the record that the court ignored. Tell us essentially why you think there's countervailing evidence such that there's a dispute of material fact as to whether the, as I understand, the district court wrote a very extensive detailed opinion in many events in which she recounted, as I understand this form, yes, they were trying to change the rule. At some point in frustration, they got some indication that they were pretty close to changing the rule. The rule wasn't actually changed, but they told the medical directors or at least a medical director that they were going to go ahead and appeal according to their belief that the stalled cycle should be paid. So to that degree, there was notice that they were going to do that and then there were some audits which turned up that they did do that and didn't do anything about it. And in 2010, there was a specific decision that yes, we know they're doing this, but we're not going to change anything. All right. So I want to know what the opposite, what your facts are that counter the notion that that's sufficient to meet an ESCOBAR standard. Yes, Your Honor, I appreciate the question because it does get to the heart of the case. These are some of those facts. The medical directors continuously told the defendants that they would not change the rule and were sticking by the rule that forbid them from doing that. That is very true. I thought they put out some document in 2003 saying, yes, you have to do this. And then in 2005, they withdrew that document. No, no, Your Honor, that is untrue. And I would point the court directly to the 10Q filed by the company on May 3rd, 2005. And it's in the records, Your Honor, on page 4965. And what it says is contrary to everything else that was mentioned here. It says the company is saying to the entire public that as of this day, and they never said otherwise in any other 10Q, two of the four medical directors are absolutely opposed to changing the rule and will not allow these claims. This is compelling evidence. And the other two, they say the company is still trying to persuade and talk to. In other words, at this time, the 10Q on May 3rd, 2005, the company is saying two medical directors will not allow us to submit and get paid for these claims. And the other two we're still on first base with. So that is strong, compelling evidence, contrary to everything else. And it's coming directly from the word of the company. But that's not all, Your Honor. There's plenty more. The Region D audit in which the court said that there were five claims denied based on our theory of the case. And the reason that the court got that wrong is because the court misinterpreted those five claims to be allowed based on the defendant's reading of the LCDs. And that's why I said there's a law there. So there were five claims disallowed in the Region D audit based on our theory of the case. In addition, there was a full OIG audit mentioned in our papers in which $20 million of claims were denied based on our theory of the case. This audit was done in 2007. That is compelling evidence, too, Your Honor, contrary to the opinion and all the facts mentioned. This 2007 audit, by the way, was used by the defendants themselves to get this case dismissed earlier on the ground that our fraud was publicly disclosed by the fact that $20 million of claims were rejected. So for the defendants to now deny their own motion, they should be stopped from doing that. So those are three pieces of evidence contrary to that the court ignored, contrary of material facts where the court got it wrong. A third piece of evidence where the court got it wrong, Your Honor, is the ALJ opinions. Because the ALJs also specifically rejected claims based on our theory of the case. Now, defendants point to some claims which were allowed by the ALJs who had medical records before them and showed medical necessity. But with regard to those few allowed claims, and it was a small part of a case because the court only adjudicated in our case the liability phase, not damages. So we have three audits, Your Honor, that reject claims based on our theory of the case. The court got that wrong. It got it wrong with regard to the Region D review because it applied the wrong standard of the LCD. It missed the other claims. I'm sorry, Your Honor? I'm just trying to be very specific about what you said. There were three audits, one that disallowed claims. One was the Region D audit and you say that there were five claims and that's just it. Correct. And then there was the OIG audit in 2007. The third was the ALJ findings that we talked about. And these were adjudications by the highest level of Medicare, the Medicare Council, which rejected claims based on our theory of the case. So there were three instances where claims were rejected in the review process and the court missed it on those. With regard to the Region D, it wasn't... I'm sorry, Your Honor? All right. Let's assume your facts are correct. So how do you apply the ESQ-R standard at that point? I think it's not clear where it falls. Essentially, it's not material just because it or where noncompliance is minor and substantial. But then it says that the defendant knows that they consistently pay claims in the minor run of cases. So that's standard. In other words, what do you have to show to show that the government is paying these? What does the government have to pay or not? How consistent does it have to be? It seems like this is inconsistent. So how consistent does it have to be? Your Honor, the sound was a little off, but I think I understood your question. I hope I did because the sound wasn't great. There were several ways in which the court missed the vote on ESQ-R. One is, as I mentioned, it didn't look at defendant's conduct here. The other is it was very clear by the SEC filing that I referred to that the medical directors were not agreeing in 2006 to go along with... were not agreeing to go along with this at all. What I want to know, and let me see if I can be heard this time, is how inconsistent does the government's behavior in paying this have to be under ESQ-R? In other words, there's some language about the minor... what happens in the minor run of cases, whether they pay it, whether they don't pay. I mean, what we seem to have here is some education that they knew they were doing this and were paying, and some education that sometimes they didn't pay. So what does that... how does that fall under ESQ-R? Okay. Your Honor, well, I don't... I believe that there is not a factual record to know for the second proposition that... the first proposition that you make, that defendants... that the government knew that this was being paid. And the reason... Didn't the company at some point specifically tell them that they were... No. No, it didn't. The only evidence that they... the evidence that they rely upon to indicate that the government had knowledge of this is notes from one of the medical directors, Dr. Hoover. Those notes are very sketchy. We never had the opportunity to depose Dr. Hoover. And in fact, those notes... and the government... if the government had decided this, we would have gotten a declaration from some government contracting office. The defendants would have put that on a record saying this is... this is what... this is what happened. I thought Ms. Morris said that... I... you told them that we're going to do it this way. Or there was something in writing where you said we're going to continue to do it this way. There is nothing in writing from her saying that. She did send a sales memo which Dr. Hughes, one of the commission... one of the doctors received. And it was only sent to him. He didn't send it off to anyone else. He regarded it as when he testified as a sales memo and not something of... as a sales memo from the company. That's the only thing they sent. They never made any kind of disclosure, a memo to the file that these guys approved or disclosure. It was very made in terms of a disclosure. It was... the record, if you knew carefully, was there was no real disclosure to the government of what was doing. This was designed to hide what was going on after repeatedly being asked to make the changes and not change them. The government didn't... the record is not strong enough to support, when looked at carefully, the fact that the government knew about it. If they knew about it, there would have been a lot more there. They would have... they would have something from a contracting officer or someone in the record saying that the government knew and approved. They don't have that. All they have is these notes from Dr. Hoover and... and they're contradicted by evidence such as the SEC filing and plenty of other evidence that... that... in the record. In addition to that, if... if the government... the defendants have tried to get this case dismissed by the government, would the government's authority to dismiss cases... I have one more question. I always have questions. The district court pointed to a June 23, 2004, email from Morris to Dr. Olick, which is about stalled cycles. For these cases, we will hold the claim for the stalled cycle, but may allow continued use for one month. We will submit claims for both cycles, etc. What about that? What... is that direct notice of what we're doing? No, it was not, Your Honor, because it was... if... if... if you look at the context of those emails during the time period, and particularly with regard to an email that Dr. Olick sent back on August 24, 2004, this was part of a negotiation that was going on to try to change the rules. And Dr. Olick is saying in that email, he... so I... I might consider this idea a stalled cycle, but that's not where it ends. His sentence goes on. It's... it's... he said, provided certain conditions are met, and they never agreed to those conditions. And that's why the SEC filing on ER 4965 is so important, because the medical directors with all... all Ms. Morris's communication... Yes, there were negotiations going on, but at the same time, in this June 23rd document, Morris said, this is what we're going to do. Meanwhile, she... she said, this is... this is what we plan to do. And the... and the negotiations were going back... back and forth, and... and they... at the... there is an email in the file from Dr. Olick in December 2004, and saying, we're not going to agree to any of this. They should know it. And that's why we have the SEC filing, because they were... they were told in no uncertain terms by Dr. Olick and the others, at the end of the year, you can't do this, because we don't have an agreement. And that's why the SEC... Thank you. Your argument is very helpful. Thank you, Your Honor. The technological question will remain unanswered. Mr. Luce. Thank you. May it please the Court. I'm Greg Luce, counsel for KCI in these proceedings. Let me just say at the outset that we would... we appreciate the Court taking this matter up on an expedited basis, because it's a companion case that's pending. Going straight to the heart of the matter, I would encourage the Court... What's pending? I didn't hear that. What's pending? I'm sorry, Ms. Differs, I'm having the same problem. Well, I don't know why, but you thanked us for taking it up, because something is pending. What's pending? There is a companion case, the Godecky case, and so the Court was good enough to take this up on So we appreciate that. What's the status of the companion case? The Godecky case has stayed pending the outcome of this Court's determination of disappeal. Go ahead. And so I would commend the Court to the record and the actual documents. This has been a routine and very disturbing problem throughout the case, that the representations about the record made by the Relators Council are not really borne out by the document. But more importantly here, we're coming before the Court on cross motions for summary judgment. On the only issue that remains, as Judge Collins asked, but I don't think was fully answered, is the risk-sharing or the stall claim issue. The Relator did not brief the other remaining issues, the monthly wound measurement and the surgical complication claims, in their appeal. And they have not really effectively briefed the Sienta argument on materiality as to the one claim that has been brought forward to the Court. But importantly here, there is no material dispute effect. Well, on the issue, I want to focus on the question Judge Berzon asked before, and that is, what is the Escobar standard? Because we do have some evidence in the record that some of these claims were caught and denied. So they sometimes enforced this rule according to the letter, the LCD according to the letter. How much of that needs to occur before we say that it's the mine run or regular? What's the standard that we get out of Escobar? I think the standard, Your Honor, is first of all, what was material to the government's determination to pay a claim? That's the test, not the defendant's conduct when it comes to materiality. And in this case, we know that these claims were routinely paid. Well, they were paid, but they weren't always paid. That's the problem. That would be true almost. There's also some evidence that although they reiterated the fact that this has to be done according to the LCD at times, and they did refuse to formally change the rule, even though they were asked to, which is some indication that they were, and said that we were going to continue to enforce this rule whether they did or not. So there's, I guess my real question is, why isn't there enough evidence to deny summary judgment? Enough conflicting evidence. And that does turn to some degree on how consistent the pattern has to be under Escobar to be material. Well, I think that there are a couple of immediate responses to that. First, Judge Schneider's opinion looked at what constituted the so-called claims denials. There was the audit of 2007. Counsel has mistaken in his judgment about how that audit turned out. 19 claims that included a KX modifier underwent an intensive review, multiple days, and a two-and-a-half-hour presentation by our client in addition to their document review. Of the 19 claims, 14 were paid using the KX modifier and implicating the risk-sharing policy. Five of the claims were denied for grounds other than the implication of a solved cycle, including the one, as Judge Schneider called out in her opinion, which involved that there was to never an improvement in the patient's will to support medical necessity. I understand that. What about the 2007 OIG audit? Sorry, Your Honor. What about the 2007 OIG audit? 2007 OIG audit reviewed claims from 2004. It was issued in 2007. It concluded that, and this is, I think, very important to Your Honor's consideration, in their review of claims, the OIG identified the fact that the DMARCs were not following their own LCD and were paying these claims. That was exactly their finding. They did not find fraud. That's another question. Who's the government? Who is the government? The ultimate payer in this case? Why are we limited, under the escobar question, to whether this particular level of review was paying the claims? The government is, in this case, the agency for payment is CMS, Center for Medicare and Medicaid Service. Right, okay. The private government contractors can interpret but do not ultimately decide whether or not a claim is covered under the reasonable and necessary standard by statute and regulation. But when the OIG notified the DMARCs that you are not following your LCD, the DMARCs certainly knew that they were still paying these claims, these very type of claims. In the mind run of cases, 250 cases were examined by the IG. I think the important thing there is that the IG applied and the standard that the IG utilized in their determination was the LCD. It was not any other statute or regulation. So what they said was, we also conclude you're not following your own LCD. And that would have been consistent with all of the discussions that went on in 2004, which were markedly different than as counsel has described. Even on July 7, there was a draft of an amendment to the LCD itself. Admittedly, the LCD was never changed. The government continued to pay under the risk sharing policy, and they have acknowledged this. What is being called Dr. Hoover's notes is in fact a document of September 3, 2010, called Call Notes. This is established as a meeting among the medical directors. It was produced by the government, and it is dispositive of whether or not the government, including their payer agents, were aware. They say, the literal reading of the policy says not to use KX if wound size increase. Next point, KCI will hold the claim for stalled month, and if next month improves, we'll bill stalled month with KX. Next point, KCI does this based on discussions in 2003 and 2004. However, no action was taken by DMDs, that's the medical directors, in policy to memorialize decisions. Our client had every reason to believe that this was an accepted practice. It did not resolve in an amendment of the LCD, and to this day, it does not resolve in an amendment to the LCD. And to this day, if a claim doesn't heal in the second cycle, our client doesn't appeal that claim. They don't pursue a challenge to the LCD. They simply write off that cost and discontinue the therapy. But if the therapy works, and the wound heals in the subsequent month, they continue to pay the claim. And the LCD has never been amended in that time. To go back, I asked Mr. Labaton for his particular examples, and the third one was ALJ opinions. He said that there were ejected claims on this basis. Is that correct? I'm sorry, I'm just very hard, yeah. Well, I'm sorry. The third example that Mr. Labaton gave was that the ALJ publicly rejected claims on this basis. Is that correct? I gather that the ALJ parent organization changed in the middle here someplace, and that your client was somewhat discontent with that because there seemed to be more likelihood of getting claims denied with the DHS, with the HHS ALJs. Were they denied? They were not denied on the basis of using the KX modifier. That's the other thing, as Judge Snyder pointed out. Claims that went on appeal were claims that were greater than the last four cycles, and they were never submitted with a KX modifier. So the claims would go up for five or six months, and those were routinely denied appeal, and KCI won most but not all of those. So the ALJ rulings were really looking at a different set of appeal points, which is really uncontroverted. I would add that I actually had four points, four points of evidence that Mr. Labaton had if we count the 10-Q. The 10-Q was not something, was not a document that was relied upon, has motion for summary judgment. It says basically that which has been said throughout the SEC filings, which is there is a disagreement. If the court is going to consider it, I'd ask that the court carefully read it because I think you would find it markedly different than represented here today. So there are four pieces of evidence, none of which go to nullify the fact that of all the evidence, I mean, the argument that the medical directors did not know is effectively and thoroughly without contradiction provided by their September meeting notes of 2010. But more to the point, there was a constant exchange of information on this, and Dr. Olick wrote... Well, there was a constant exchange of views as to whether the LCD should be changed. In the end, it wasn't changed. That's what's so peculiar. It was never changed. So your suggestion essentially is that the government officials or officials acting on behalf of the government determined that they were going to shove this under the rug or under the table. And although continuing to tell people that they were applying Rule X, they really were allowing your client to not follow that. That's your contention. And Escobar seems perhaps to countenance that as showing materiality, but that's the portrayal. Is that right? Yes. That they knew that they refused to change the rule, but they knew it was being violated and they continued to pay. They did. And there's no evidence that truly contradicts their knowledge. And again, I would commend to the court the record, particularly from January of 2004 through September of 2004, when the correspondence shows, and what has been dismissed as a marketing point, was in fact the communication that was distributed to each of the medical directors saying, this is how we bill. We will continue to bill this way. Right. This is how we will bill. I'm sorry. I was speaking over you, Your Honor. This is how we will bill. I mean, it wasn't clear that they weren't saying, this is what we would do if you approve changing the rule, as opposed to this is what we're doing now. It was made very plain and the judge found appropriately to not take out the semantic, you know, hail Mary offered by the relator here. It was very clear. One of the reasons it's clear is it was written in February. It was shared with Dr. Hughes about a month later and shared with all of the other medical directors in April. The whole sequence of communication shows, this is how we're billing. And of course it's confirmed six years later in a call note among most of the same medical directors. Yeah, I think it's critical to understand that there was no question in the mind of KCI, nor was there a question in the mind of this relator who himself said in the summer of 2004, well, I think we have an agreement. I think we could proceed now. That document is in the record as communication from Mr. Hart Pence, the relator here. Who also said that he believed in the course of the audit that they would be found to do everything right. Mr. Hart Pence has offered no declaration in this case. None of his testimony is cited by the relator. He has made no statement in support of his motion for partial summary judgment or in opposition to ours. He was a senior business officer who oversaw this entire function. I think it's critical to understand for the court's full appreciation that the documents that are being characterized and argued against do not provide the relator with any evidence that confronts those facts that have been put into evidence by KCI at summary judgment. They are not entitled to an inference on an inference. Their facts are not there. And I think there are other cases. Your honor. I had a quick question before your time runs out on your alternative argument on Azar versus Alina. They've said in the reply that because of the contractual obligation you undertook to comply with the LCDs that that argument fails as a matter of law. What's your response to that? It could not come in the course of a contract create a legal obligation that hadn't been established by the agency following notice and rulemaking. Notice of comment and rulemaking. So it couldn't have been material. I'm sorry, Judge Marzano. The LCD sets out a rule but it also sets out that a procedure that you're supposed to write KX to mean... Maybe this is a variant of the contract argument but it seems to me it's not so much a regulatory declaration as a statement about how to fill out a piece of paper and what we're going to understand you to have said when you fill it out. And I don't understand why that's not informative as to what that piece of paper means if you write KX. It doesn't really... It's not a question of whether the LCD rules are enforceable. It's whether the fact that you... If you were told that you write KX it means certain things and it's going to be taken to mean those certain things. Well, I think it does have to be enforceable in order to be material. But with respect to the factual representation in the absence of the clear record showing that the DMARCs understood how we were built... No, but I'm talking about the Marlena argument that somehow these LCDs are off the table. It doesn't seem to me... It's not so much that the LCDs are enforceable in the abstract. It's that the LCDs tell you how to fill out a piece of paper and what we're going to understand on the piece of paper. And I don't understand why an agency or an administrative doesn't do that. It happens all the time. They fill out a piece of any government form and there are directions about how to fill it out. And that's what this is. Well, I think Escobar... It's not a substantive rule about what we're going to do with it. It's saying you can write KX. It means that you didn't fill for a stalled cycle. Well, Your Honor, I think there are two issues. One, is it a factual misrepresentation? The court, district court... I'm now on the other argument that somehow these LCDs are irrelevant. And I'm saying I don't see why they're irrelevant that way. I'm not saying they're irrelevant, Your Honor. What I'm saying is that, first, there was not a misrepresentation of a material fact that led the government to make the claim that it would not have otherwise paid... It wasn't a misrepresentation in terms of what they were told KX means. Because KX means that you follow a set of criteria. And in fact, they didn't. So it was a misrepresentation. You're saying it was essentially a condoned misrepresentation or a known misrepresentation. It was understood that there was a difference between the policy expressed in the LCD and the payment practices of the DMERS throughout the history of this case. Therefore, it was okay to say something that wasn't true. It was okay to say something that our client understood would not have made a difference to the decision of the government payor. In this case, the DMERS... Even though it wasn't true. I mean, you still have to... Yes, yes. Even though it wasn't exactly accurate. Because that's exactly what Esme Skobar says. The label of something is not sufficient to create a falsity. It has to be measured by, A, did it affect the payment? Here, it did not. B, did the defendant believe that it would affect payment and submitted a false claim anyway? And here, that was clearly not the case. The record is uncontradicted on the client's knowledge. I have exhausted my time. If there are no further questions, I thank the court. Thank you. Yes, yes, Your Honor. I'd like to make a few quick points. Number one is the reason that these claims went under the radar, despite the defendants being told they couldn't make them, was because this was an automated pay system. They got paid automatically. The defendants say in their motion for summary judgment, otherwise, they say that each DMRC reviewed all the claims personally. Not so. We disputed that fact. It was automated pay system. Once the claim was submitted without documents, it was false. It got under the radar because it's automated. The other proof of the defendant's fraud scheme is in a document in the supplemental excerpts of record. It's by Gera Sitton. She works in the appeal section. She sends this email to Teresa Johnson, who's the vice president of the company, and she says, let's not appeal fifth-month claims because if we appeal these fifth-month claims, they're going to discover that there was no documentation of measured improvement for all these other month's claims. All of that will forego the fifth-month money because by doing that, we conceal that we got money from directly violating the medical director's instruction. That document is in the supplemental excerpts of record, and I urge the court to look at it. I also urge the court to look at the defendant's own filing when they moved to dismiss this case, in which they admit that the OIG finding specifically rejected $20 million of claims that fit our theory of the case, and I urge the court to look at the OIG report on that as well. The OIG was not an enforcement claim. The OIG was reviewing the enforcers. Correct. The OIG didn't reject the claims because it didn't have the authority to reject the claims, right? It essentially could have been rejected, but they weren't. Doesn't that cut in the other direction? By demonstrating, at least once they told them that and the fact that they didn't change anything, just that they knew very well that they were doing this, or actually doing it? The company knew that $20 million of claims were not being paid. What about the administrators, the medical directors and CMS and so on? They're now being told by OIG that a very large number of these claims shouldn't have been paid because they don't comply with the stalled cycle rule, and did they do anything about that? Did they try and get the money back? Did they get more careful in the future or anything? Well, they kept to the direction that they're not allowed to do that, and that's revealed in the SEC filing that I mentioned, Your Honor. They also... I thought the compiling was before that, no? That was contemporaneous, Your Honor. That was about contemporaneous. All right. But I'm asking whether the administrators changed their administration and told that all these claims shouldn't have been paid. I don't know the answer to that, Your Honor. I know that the money came back to them, and they thought it was caught, and the company was aware that they shouldn't be doing this. These were 2004 claims, so I don't... They were all tens. They knew that the process was bad. Now, 2004 was when the negotiation was going on. It ended at the end of 2004, so they might have had some basis to think there might be some question with those that year. But regard to one of the other points that Mr. Luce made was the draft that he mentioned, a draft change in the rules, and he said it was substantially adopted. If you look at the draft, Oliver deliberately crossed out conditions that he would not agree to, including that measurement be based on these terms, tunneling and undermining, which were considered by him not reliable measuring standards. So they were not even... They were not close to a deal in 2004. Ms. Morris testified, and this is in the record, that the only time they thought they were close to a deal was that year, 2004, and the company clearly knew that it was prohibited since then. But it's the obligation of the company to comply with these rules that the medical directors made clear that were their policy. And once the plan submitted, as I said, it is false, and the company relied on the fact that it would go under the radar because of this automated system and because of the way they gamed appeals and all sorts of other things that after, certainly, as long as possible, it would go undetected, and the government wouldn't find out and wouldn't have to ask for this money back. But they did get it. Thank you very much. Thank you, Your Honor. I appreciate your argument.
judges: Baldock, Berzon, Collins